IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.                          **Case No. 11-40101-01/02-RDR**

RODOLFO PEREZ-GUERRERO and
DAGOBERTA ARREOLA-GONZALEZ,

                Defendants.

_____

## MEMORANDUM AND ORDER

The court held a hearing on the pretrial motions on January 17, 2012.  At the conclusion of the hearing, the defendants asked for additional time to file supplemental briefs on the motions to suppress.  The government then requested time to file a responsive brief.  The court allowed both motions.  The government's brief was filed on January 30, 2012.  The court is now prepared to provide some rulings on the pending motions.

The defendants are charged with manufacturing and possessing with intent to distribute approximately 1400 plants of marijuana in violation of 21 U.S.C. § 841(a)(1).  The charges arise from a traffic stop in Greenwood County, Kansas.

Defendant Perez-Guerrero has filed the following motions: (1) motion for notice of evidence; (2) motion for notice of co-conspirator hearsay evidence; (3) motion to disclose expert testimony; (4) motion to exclude witness statements; (5) motion to

join defendant Arreola-Gonzalez' motion to suppress; and (6) motion to suppress cell phone search.   Defendant Arreola-Gonzalez has filed a motion to suppress.

**MOTIONS TO SUPPRESS**

Arreola-Gonzalez seeks to suppress all physical evidence seized during the search of the vehicle he was driving on August 8, 2011 and all statements he made subsequent to his arrest on that date.  Perez-Guerrero seeks to join in the motion to suppress filed by Arreola-Gonzalez.  He also has filed a (1) motion to exclude witness statements; and (2) motion to suppress cell phone search.

Based upon the evidence presented, the court makes the following findings of fact and conclusions of law.  These findings of fact pertain to the various motions to suppress filed by the defendants.

*Findings of Fact*

On August 8, 2011, Jason Myers, a deputy with the Greenwood County Sheriff's Office, was patrolling in rural Greenwood County at approximately 10:30 p.m.  Deputy Myers had been a deputy with the Greenwood County Sheriff's Office since October 2010.  He had previously worked as a corrections officer.  As he drove by an old, abandoned farmhouse, known as the Beamis House, he observed some movement in the brush.  He initially thought it might be a deer, but ultimately believed that it was human activity.  He got out of his marked pickup truck and explored the road that leads to the

2

Beamis House.   There is a locked gate at the end of the road.   On the other side of the gate he saw an empty five-gallon water bottle and two green duffel bags.   He thought these items had been left there recently because the water bottle still had moisture in it and the duffel bags looked clean.

The Beamis House had been the source of activity in recent years.   Officers had found that teenagers had used it for alcohol and drug parties.   The items discovered by Deputy Myers were consistent with items that had been discovered at marijuana growing operations in the area.   The duffel bags were used to carry items into and out of the fields, and the water bottles provided a water source at the campsites near the marijuana operations.   The closest marijuana grow operation to the Beamis House that Greenwood officials had discovered was four to five miles away.

Deputy Myers pulled his truck to the side of the road and radioed the Undersheriff of Greenwood County and another deputy. He reported to them what he had found.   Undersheriff Romans told him to remain at that location to see if anyone returned.   The deputy he spoke to, Matthew Clemons, indicated that he would start traveling to that location in case he needed help. Deputy Myers' truck was easily visible to anyone traveling on that road.   As he was on the radio, he saw headlights.   A car passed him and proceeded down the road, slowing at the entrance to the Beamis House, and then proceeding.   Deputy Myers followed in his truck.

He got close enough to the car to see its license plate.  The plate was a Kansas plate from Sedgwick County.  He radioed that information to his dispatcher and learned that the car was registered to Jose Gandara.  The car continued to travel on the rural road, which was gravel, and then eventually made its way to Highway 400, a two-lane, paved road.

The car turned onto Highway 400 and began traveling west. Deputy Myers continued to follow it.  As he followed the car, Deputy Myers noticed that the car crossed the fog line on the right.  The tires on the passenger side crossed over the fog line. About a mile later, the car moved across the center line of its lane.  This time it was more than a tire width over the line. Deputy Myers characterized the car as "straddling the center line." Once again, about a mile later, the car again moved across the center line about a tire's width.  On this night, there was no significant wind or weather conditions that would cause a vehicle to move out of its lane.  Deputy Myers noticed no other conditions that would have caused such actions by the driver.  Deputy Myers decided to stop the vehicle to investigate the traffic violation and to determine if there was anything wrong or if the driver was tired.

Deputy Myers turned on his emergency lights and effectuated a stop of the car.  The stop of the car occurred at 10:41 p.m.  The distance between the point where the car turned onto Highway 400

4

and where it was stopped was approximately four miles. That stretch of the highway is predominately straight. As he walked to the vehicle, he noticed a female with an infant child in the back seat. He also saw a five-gallon water jug with duct tape covering the top of it. He also noticed a paper bag with beer cans and liquor bottles in it in the back seat. The beer cans were Budweiser with a red, white and blue patriotic theme. Deputy Myers thought this was significant since he had seen similar looking beer cans at a marijuana growing operation in July.

Deputy Myers learned that Dagoberto Arreola (later discovered that his full name was "Dagoberto Arreola-Gonzalez") was the driver of the vehicle. Rodolfo Perez (later discovered that his full name was "Rodolfo Perez-Guerrero") was the passenger. Patricia Lopez was the woman in the back seat with the baby. He quickly determined that neither Arreola-Gonzalez nor Perez-Guerrero spoke English. Ms. Lopez, however, spoke fluent English and Spanish. Ms. Lopez proceeded to act as an interpreter for Arreola-Gonzalez and Perez-Guerrero. She told Deputy Myers that Arreola-Gonzalez and Perez-Guerrero did not have drivers' licenses or any forms of identification. She also did not have a driver's license. She provided Deputy Myers with a high school identification card from a Wichita high school. She was 18 years old. The baby was one month old.

Deputy Myers asked Ms. Lopez what they were doing on that

evening.  She indicated that they were looking for an address.  She further suggested they were looking for a friend.  Perez-Guerrero and Arreola-Gonzalez provided no information.  Deputy Myers subsequently cited Arreola-Gonzalez for driving without a license, no proof of insurance, and driving left of center.  He acknowledged at the court's hearing that he meant to cite him for failure to maintain a single lane of travel, not driving left of center.

Deputy Clemons subsequently arrived at the scene of the stop. Deputy Clemons has been a deputy sheriff with Greenwood County for five years.  He initially spoke with Deputy Myers, who told him that none of the occupants of the car had a driver's license.  He had Arreola-Gonzalez step out of the car and walk back between Deputy Myers' truck and his truck.  His truck was also a marked police vehicle.  Both officers were dressed in standard police uniforms and were armed.  He immediately learned that Arreola-Gonzalez did not speak English.  He was able to ask him why he and the others were in the area.  Arreola-Gonzalez indicated that they were driving around the area when Deputy Myers saw them.  Deputy Clemons asked him why they were driving around that area, and Arreola-Gonzalez did not understand what he was asking.  He spoke again with Deputy Myers, who told him that Ms. Lopez spoke English. He then made contact with Ms. Lopez.  She told him that they were there because they were looking for an address.  She said she did not know the address but the men in the car did.  He asked her if

6

there were drugs or weapons in the car.  She replied that there
were not and he could search if wanted to do so.

Deputy Clemons then had Ms. Lopez walk back to the area where
Arreola-Gonzalez was standing.  She told Deputy Clemons that the
man was her husband and that the child in the car belonged to them.
Deputy Clemons had her ask Arreola-Gonzalez several questions and
translate the answers to him.  He asked her to ask him where they
were going.  She related that he said they were going to Wal-Mart.
Deputy Clemons told her that it made little sense to travel 70
miles from Wichita to find a Wal-Mart.  She said she was simply
relating what Arreola-Gonzalez had told her.  Ms. Lopez
subsequently said they were traveling to Emporia, Kansas and got
lost.  Deputy Clemons told her that he believed they were lying to
him.  He went to the car and got Perez-Guerrero and brought him to
the area where Arreola-Gonzalez and Ms. Lopez were standing.  He
was standing approximately six feet from where Arreola-Gonzalez and
Ms. Lopez were standing.

Deputy Clemons then took Ms. Lopez back to the car.  He told
her that he believed they were involved in a marijuana growing
operation.  She denied any knowledge of that and indicated that she
was just riding in the car with her baby.  She again stated that
Deputy Clemons could check the car.  He asked her to open the
trunk.  She did so and he observed two large trash bags inside.  He
was unable to see into them because they were tied shut.  Ms.

Lopez, who was standing next to Deputy Clemons when he opened the trunk, told him that they were groceries she had bought that day and not taken out of the car.

Deputy Clemons then radioed Undersheriff Romans. He reported that he had found two large trash bags in the trunk of the car. Undersheriff Romans directed Deputy Clemons to handcuff and detain the occupants of the car. The occupants were then patted down and handcuffed. Deputy Clemons then conducted a more thorough search of the car. He found $200 in the car. He opened the trash bags and found a large amount of food. He also saw some camouflage shorts. In the trunk, he also discovered a five-gallon gas can with gas in it. He also found a five-gallon water bottle in the back seat along with some beer and liquor. He found a green backpack in the front passenger floor area. In it, he discovered a battery pack for jump starting items, two cans of chewing tobacco and a bottle of Pedialyte. Deputy Clemons found no illegal drugs, firearms or contraband in the car.

After the search of the car, Deputy Clemons placed Ms. Lopez in the car with the baby. He gave her the Miranda warning. Ms. Lopez said she understood her rights and was willing to talk with Deputy Clemons. He told her that if she and her husband were arrested, he would have to place her daughter in state custody. Ms. Lopez was quite upset by this statement. She appeared nervous at the possibility of this happening. Ms. Lopez then told him that

8

all three of them were in the United States illegally.  Deputy Clemons then contacted ICE agents in Wichita and told them to meet him at the Sheriff's office.  Undersheriff Romans and Sheriff Bitler eventually arrived on the scene.

The defendants were then transported to the Greenwood County Sheriff's office.  This occurred at about 12:30 a.m.  The defendants had been at the traffic stop for about two hours.  At the Sheriff's office, Deputy Clemons again spoke with Ms. Lopez. This interview began at about 1:10 a.m.  The interview was videotaped.  As Deputy Clemons entered the interview room, Ms. Lopez was crying.  She then sobbed:  "Please don't take my baby." Deputy Clemons responded:  "That is what we are trying to avoid. That's the last thing we want to do."  Deputy Clemons then reminded her of her <u>Miranda</u> rights.  He also provided her with a form that indicated that she understood her rights and was willing to waive them.  She signed the form.  Ms. Lopez was nervous and upset.  She cried at various times during the interview.  She was not handcuffed and her baby was with her in the interview room.  Deputy Clemons spoke to her in a conversational tone throughout the interview.  Ms. Lopez began to explain some of what was occurring prior to her arrest.  Deputy Clemons was not entirely satisfied with her responses.  He then told her:  "The last thing I want to do is take your baby.  That is not necessary as long as I find out the facts."  He reiterated the same thing again shortly thereafter:

"The more you work with me, the more I can make sure you go home with your baby."  Subsequently, Ms. Lopez again said:  "I don't want to lose my baby."  Deputy Clemons informed her that would not happen unless he was forced to put her in jail.  He stated:  "If there is no reason to arrest you, you can go home with your baby."  Later he stated:  "The more you tell me, the better off you'll be."  Ms. Lopez then began a detailed account of what had occurred during the course of the evening and in the days preceding that night.  Towards the end of the interview, Ms. Lopez again stated:  "I just want to go home with my baby."  She also said:  "I don't want my baby taken away."  Deputy Clemons responded:  "As long as you're straight with me, you'll be fine."   This interrogation lasted approximately thirty minutes.

Ms. Lopez was then interrogated by Chris Baumgarner, an agent with the Kansas Bureau of Investigation.  This interview began after 2:00 a.m. and lasted just over thirty minutes.  Agent Baumgarner thought that Ms. Lopez was scared but cooperative.  Agent Baumgarner also conducted his interview in a conversational tone.   At the outset of the interview, Ms. Lopez told Agent Baumgarner that she wanted to get her and her baby out of there.  Agent Baumgarner responded:  "This is the best way to do that, to be straight with us."   She then proceeded to provide some information on the events of the evening.

The arrest report for the defendants indicated that they had

been arrested for "unlawful cultivation of a controlled substance (marijuana)."  This charge was based upon the items found in the car because they were consistent with items found at other marijuana fields.  Arreola-Gonzalez had also been charged with the aforementioned traffic offenses.  The next day, law enforcement officers found marijuana growing near the Beamis House.

At the hearing, Ms. Lopez testified that she did not remember the car swerving on the night prior to the stop.  She also said she did not see the car travel over the fog line or the center line.  She said her view from the back seat was not obstructed.  She did acknowledge, however, that her attention may have been distracted by her focus on her baby.  She further observed Perez-Guerrero with a cell phone in the car.  She identified the cell phone taken by the police officers as the one that Perez-Guerrero possessed that night.  She also stated that she believed she had no choice but to talk to the officers because of their constant threats to take her baby and place her in state custody.  During her testimony, she referred to Arreola-Gonzalez as either her husband or her boyfriend.

*Conclusions of Law*

Arreola-Gonzalez contends that Deputy Myers did not have probable cause to stop the vehicle.  He suggests that the facts do not support a reasonable suspicion that K.S.A. 8-1522(a) was violated.  He further argues that the officers had no probable

11

cause to arrest them.  He notes that the officers found no contraband in the vehicle.  He also argues that no valid consent was given because there was no reason to believe that Ms. Lopez had authority to give consent to search the car.  Finally, he asserts that, even if she did have authority to consent, the consent was not freely given.  Perez-Guerrero seeks to join in this motion. This motion shall be granted to the extent that Perez-Guerrero has standing to join in the motion.

After all the occupants of the car were in custody, Ms. Lopez provided information to the officers about their status as citizens and about the events of the evening.  Perez-Guerrero contends that her statements should be excluded because they were not voluntarily made.  He contends that she made the statements only after she was told that her infant child, who was with her, would be taken from her and placed in state custody if she did not cooperate.  Arreola-Gonzalez contends that Ms. Lopez' statements should be suppressed because they were the product of the occupants' illegal detention.

The government contends that the defendants' arguments concerning the stop, their detention, the consent to search the car, and their arrest lack merit.  The government further argues that the defendants lack standing to (1) seek suppression of the statements made by Ms. Lopez; and (2) seek suppression of the items taken from the automobile.

**Standing**

12

The court shall initially consider the arguments of the government concerning standing to challenge the constitutionality of the search of the car. The government asserts that Arreola-Gonazalez lacks standing to contest the search of the car because he did not own the car he was driving. The government further argues that the passenger, Perez-Guerrero, also lacks standing because he failed to show a possessory or property interest in the car.

"Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." United States v. DeLuca, 269 F.3d 1128, 1131 (10th Cir. 2001) (quoting United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)) (internal quotation marks omitted). Absent a possessory or property interest in the vehicle searched, "passengers lack standing to challenge vehicle searches." United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995). Further, a non-owner driver of the vehicle has no standing to challenge the constitutionality of a search of the vehicle unless he can establish that "he gained possession from the owner or someone with authority to grant possession." United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003). "Where the proponent of a motion to suppress is the car's driver but not the registered

owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." Id.

In accord with the foregoing, the court finds that the defendants lack standing to challenge the constitutionality of the search of the car. Arreola-Gonzalez failed to produce any evidence that he personally obtained possession from the registered owner, Jose Gandara. The defendants, however, can challenge the lawfulness of their own detention, and move to suppress the evidence discovered as a result. See United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).

**The Initial Traffic Stop**

Traffic stops are seizures within the meaning of the Fourth Amendment analogous to investigative detentions. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). A traffic stop is lawful if the detaining officer has a reasonable suspicion that (1) criminal activity may be afoot, see United States v. Arvizu, 534 U.S. 266, 273 (2002), or (2) a traffic violation has occurred or is occurring, see United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993).

The burden rests with the government to prove the reasonableness of the officer's suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998). "A variety of factors may contribute to the formation of an objectively

14

reasonable suspicion of illegal activity." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998). "The law does not specify a minimum of factors necessary to constitute reasonable suspicion." United States v. Gutierrez-Daniez, 131 F.3d 939, 942 (10th Cir. 1997) (citation omitted), cert. denied, 523 U.S. 1035 (1998). Arriving at reasonable suspicion is a process dealing with probabilities, not hard certainties, "'as understood by those versed in the field of law enforcement.'" Gutierrez-Daniez, 131 F.3d at 942 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Instead of closing their eyes to suspicious circumstances, officers may call on their own experience and training to judge facts and even "perceive meaning in actions that appear innocuous to the untrained observer." Gutierrez-Daniez, 131 F.3d at 942 (citation omitted). On the other hand, "[i]nchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion." Salzano, 158 F.3d at 1111 (quotation omitted). "While the necessary level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, the Fourth Amendment requires some minimal level of objective justification." Gutierrez-Daniez, 131 F.3d at 942 (quotation omitted).

The court "judge[s] the officer's conduct in light of common sense and ordinary human experience." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (citation omitted). "This approach

15

is intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." Gutierrez-Daniez, 131 F.3d at 941 (quotation omitted). Rather than pigeonholing each fact as either innocuous or suspicious, we look at the totality of the circumstances in determining whether reasonable suspicion justified a longer detention. Mendez, 118 F.3d at 1431.

To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." Soto, 988 F.2d at 1554. Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

The government has suggested that Deputy Myers had reasonable suspicion to stop the car in which the defendants were passengers for violating K.S.A. 8-1522(a), which provides as follows:

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, .... [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Deputy Myers originally gave Arreola-Gonazalez a warning

ticket for a violation of K.S.A. 8-1514 (left of center violation), not K.S.A. 8-1522(a).  At the hearing on the motions to suppress, Deputy Myers indicated that he had intended to give him a ticket for a violation of K.S.A. 8-1522(a).  He suggested that he had written down the wrong number on the tickets.  Given the circumstances, the court found his testimony on this issue credible.  The court shall consider whether Deputy Myers had reasonable suspicion to stop the car for a violation of K.S.A. 8-1522(a).

Relying on State v. Marx, 289 Kan. 657, 215 P.3d 601 (2009), Arreola-Gonzalez contends that Deputy Myers lacked reasonable suspicion to stop the car for a violation of K.S.A. 8-1522(a). K.S.A. 8-1522(a) states that a vehicle must be driven "as nearly as practicable entirely within a single lane."  The Kansas Supreme Court and the Tenth Circuit Court of Appeals have addressed the requirements of K.S.A. 8-1522(a) in a number of opinions.  The court is not persuaded that Marx has significantly changed any of the guidance previously provided by these courts.

In Marx, the Kansas Supreme Court was again faced with interpreting this statute.  The Court found that the single lane rule requires "more than an incidental and minimal lane breach." 215 P.3d at 612.  The Court held that to establish reasonable suspicion "a detaining officer must articulate something more than an observation of one instance of a momentary lane breach."  Id.

17

The Court then considered whether a driver who had crossed the fog line, overcorrected, and then crossed the centerline constitutes a violation of the statute.  The court ultimately determined that the state had failed to carry its burden that the deputy had reasonable suspicion that the driver had violated the statute because (1) the deputy had only observed one instance where the vehicle did not maintain a single lane of travel; (2) no testimony had been offered on how far the vehicle crossed either the fog line or the centerline; (3) the deputy had not offered any information on traffic conditions; and (4) no testimony was offered which the court could even infer that it was practicable to maintain a single lane of travel.  Id. at 613.

The decision in Marx is not noticeably different from the interpretations of K.S.A. 8-1522(a) reached by the Tenth Circuit in the past.  The Tenth Circuit has determined that an officer's observation of a vehicle straying out of its lane multiple times over a short distance violated K.S.A. 8-1522(a) so long as the strays could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement.  United States v. Ozbirn, 189 F.3d 1194, 1198 10th Cir. 1999); see also United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003); United States v. Zabalza, 346 F.3d 1255, 1258-59 (10th Cir. 2003).

In applying the teachings of Marx, the court finds that it is

distinguishable from the facts in this case.  Here, Deputy Myers observed Arreola-Gonzalez fail to maintain his lane of travel on three occasions over several miles.  On each occasion, Deputy Myers noted that Arreola-Gonzalez had driven his car at least a tire's width over the lane marker.  During one instance, he noted that the car straddled the centerline for some distance.  Deputy Myers further testified that he did not notice anything that would cause the vehicle to swerve or drift or that would prevent Arreola-Gonzalez from maintaining a lane.  Thus, the evidence presented by the government establishes more than an incidental or momentary lane breach.

In support of this motion, the defendants presented the testimony of Ms. Lopez at the suppression hearing.  She testified that while she was riding in the backseat of the car, she did not observe the car swerve or travel off the roadway or across the centerline.  She did, however, acknowledge that she was not entirely focused on her husband's driving because she was paying attention to their baby who was riding with her in the backseat. The court did not find Ms. Lopez' testimony credible on the path of the car.  She was no doubt paying close attention to her baby. Deputy Myers, on the other hand, was focused solely on the path of the car he was following.  In addition, the court believes that Ms. Lopez' relationship with her husband may have influenced her testimony.  Under all of the surrounding facts and circumstances,

19

the court finds that the traffic stop was justified by reasonable suspicion that Arreola-Gonzalez violated K.S.A. 8-1522.  With this determination, the court need not consider whether other reasonable suspicion of criminal activity existed to justify the traffic stop.

**Scope and Duration of the Detention**

The defendants next contend that the scope and duration of their detention exceeded the limits of the Constitution in this case.  An investigatory stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968).  In order to satisfy this requirement, the ensuing detention "must not exceed the reasonable duration required to complete the purpose of the stop." United States v. Rice, 483 F.3d 1079, 1082 (10th Cir. 2007).  Accordingly, in the context of an investigatory stop of a motorist, "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009).  The detention cannot be continued beyond this point "unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot." Rice, 483 F.3d at 1083–84.  Even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment.  See United States v. Lopez, 443 F.3d 1280, 1285 (10th Cir. 2006) ("The Supreme

20

Court has also made clear ... that an individual 'may not be detained even momentarily without reasonable, objective grounds for doing so.'"(quoting <u>Florida v. Royer</u>, 460 U.S. 491, 498 (1983))).

After the stop of the car, Officer Myers made several observations concerning the contents of the car. In particular, he saw a five-gallon water bottle that was similar to the one he had observed outside the Beamis House. In addition, it was similar to other water bottles that he had seen at marijuana growing observations. The court believes that the circumstances at this point justified a continued <u>Terry</u> investigative detention. Officer Myers had seen (1) what he believed were individuals running into the brush at the Beamis House; (2) two duffel bags and five-gallon water bottle near the Beamis House; and (3) a car travel slowly past the Beamis House, almost coming to a stop, just after he had seen the aforementioned matters. This information coupled with his subsequent observation of the water bottle in the car, along with his prior knowledge of marijuana growing operations in the area, is sufficient to prove the reasonableness of his suspicion.

**Consent**

The court next turns to the issue of consent. Arreola-Gonzalez contends that law enforcement officers did not have consent to search the car. He asserts that the government did not demonstrate that Ms. Lopez had authority to allow the search. He further suggests that her consent was not voluntary.

21

The Fourth Amendment requires, as a general matter, that police procure a warrant before searching or seizing property. Arizona v. Gant, 556 U.S. 332, 338 (2009). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." Illinois v. Rodriquez, 497 U.S. 177, 181 (1990) (internal citations omitted).

The first issue is whether Ms. Lopez had actual or apparent authority to allow the officers to search the car. Actual authority, which the government must prove by a preponderance of evidence, rests on the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974). The Tenth Circuit has further clarified that actual authority requires "either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). Apparent authority exists when officers reasonably, even if erroneously, believe that the person allowing entry has the authority to do so. See Rodriquez, 497 U.S. at

22

188-89.

The government has not suggested that Ms. Lopez had actual authority to consent to a search of the car.  The government, however, does contend that she had apparent authority.  We must agree.  The court is persuaded that apparent authority has been demonstrated because Deputy Clemons reasonably believed that Ms. Lopez had authority to allow him to search the car.  The facts available to him at the time the search was allowed would warrant a person of reasonable caution to believe that she had authority to allow others to search the car.  Deputy Clemons was aware that the driver of the car was Ms. Lopez' husband.  From the beginning of the stop, Ms. Lopez acted as if she had control over the car and she twice asked Deputy Clemons if he wanted to search it.  In addition, there was no indication by Arreola-Gonzalez that he objected to the search of the car while it was being conducted.  Although it is undisputed that he spoke only Spanish, he certainly could have registered his displeasure with the search individually or through his wife if he had a problem with it.  Accordingly, the court finds no merit to this argument.

Next, we must consider whether Ms. Lopez "freely and voluntarily" gave consent to search the car.  Voluntariness is a question of fact to be decided based on the totality of the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).  Consent is voluntary if, in light of all the

23

circumstances, a reasonable person would have felt free to decline the request to consent.  United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007).  There is little question that Ms. Lopez freely and voluntarily gave consent to search the car.  She was never asked for consent to search the car.  She readily offered a search of the car to Deputy Clemons on two occasions.  The court finds no support for the suggestion that her offers to Deputy Clemons to search the car were anything but voluntary.  There is some suggestion by the defendants that Deputy Clemons' statement to Ms. Lopez that he may be forced to place her baby in state custody if she were arrested vitiated any voluntary consent by Ms. Lopez. The court finds no merit to this argument because the evidence shows that she made the offers to search the car prior to any statement by Deputy Clemons about placing her baby in state custody.

**Exclusion of Statements Made by Ms. Lopez**

Perez-Guerrero contends that the statements made by Ms. Lopez should be suppressed because they were not voluntarily made.  He contends that they were made as the result of threats to take Ms. Lopez' baby if she did not cooperate.  As noted earlier, Arreola-Gonzalez has suggested that the statements should be suppressed as fruit of the illegal detention of the occupants of the car.  The government has suggested that the defendants have no standing to suppress the statements made by Ms. Lopez.

The court is not persuaded by the government's argument. The court notes the government has failed to cite any case law in support of its position. The Tenth Circuit has rejected the government's position and determined that a defendant does have standing to contest a witness's confession as coerced. A defendant's right to due process is implicated when a witness is coerced into making a false statement and the false statement is admitted at trial. United States v. Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999). The standard for determining whether a statement is voluntary is the same for a defendant or a third-party witness. Id. at 1289 n. 1.

In determining whether a statement was involuntary, the court looks to the totality of the circumstances. See Schneckloth, 412 U.S. at 226. A statement to law enforcement is involuntary when "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Erving L., 147 F.3d 1240, 1248-49 (10th Cir. 1998). The following factors are helpful in assessing whether a particular statement was the product of coercion or an overborne will: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." United States v. Toles, 297

F.3d 959, 966 (10th Cir. 2002).

The courts have long determined that express threats that a defendant's children will be taken away if she fails to cooperate have been held to be so coercive that the defendant's statements were rendered involuntary.  See Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (defendant's oral confession was involuntary where it was made after police told her that state financial aid would be terminated and her children would be taken from her if she did not cooperate); United States v. Tingle, 658 F.2d 1332, 1337 (9th Cir. 1981) (confession was involuntary where defendant was threatened that she would not see her child for a long time if she did not cooperate).   In Tingle, the Ninth Circuit articulated the foundation for this belief:  "The relationship between parent and child embodies a primordial and fundamental value of our society.  When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert 'improper influence'. . ."  Tingle, 658 F.2d at 1336; see also Samuel v. Frank, 525 F.3d 566, 575 (7th Cir. 2008) (Rovner, J., concurring) ("Civilized governments do not take babies away to coerce a victim's testimony--even in the name of protecting that victim and others.").

Having considered the totality of the circumstances, the court is persuaded that all of the statements made by Ms. Lopez after she

was arrested were made involuntarily.  As a young mother of eighteen with a limited education, Ms. Lopez was particularly susceptible to psychological coercion.  Moreover, the interview was conducted over a three-hour period and occurred late at night.  Ms. Lopez was repeatedly told over the course of the evening that she needed to cooperate or she could lose custody of her child.  She became quite nervous and upset when Deputy Clemons first mentioned that her baby would be placed in state custody if she and her husband were arrested.  Deputy Clemons repeated that theme on a number of occasions when the interview continued following the trip to the Sheriff's Office.  He made clear that cooperation was the only thing that would prevent her baby from being placed in state custody.  The distress of Ms. Lopez was evident during her interview with Deputy Clemons.  Accordingly, the court finds any statements that were made after she was subjected to custodial interrogation at the roadside were involuntary even though the statements were made after Ms. Lopez had been given a Miranda warning and had agreed to waive those rights.  The court finds that psychological coercion by Deputy Clemons produced these statements.  Therefore, these statements were not the product of free will.

As pointed out by the government, the Tenth Circuit has not determined the proper remedy when a court determines that a third-party statement is involuntary based upon the coercion of law enforcement.  In Gonzalez, the case in which the Tenth Circuit

27

determined that a defendant's right to due process is implicated when a witness is coerced into making a false statement, the Court ultimately determined that the witness's statement was not coerced. 164 F.3d at 1291. Thus, the Court failed to address "what procedures a district court should follow in the event that proferred statements from a third-party witness are proven to be involuntary." Id. at 1291 n. 2.

The Supreme Court has not decided this issue. Some courts have excluded such a statement only if it is unreliable, which requires that a higher level of coercion be shown. United States v. Merkt, 764 F.2d 266, 273-75 (5th Cir. 1985); State v. Samuel, 252 Wis.2d 26, 643 N.W.2d 423, 431-32 (2002). Other courts have decided that the exclusionary rule is inapplicable to third-party statements. Buckley v. Fitzsimmons, 20 F.3d 789, 794-95 (7th Cir. 1994).

The court does not believe that the parties have had an adequate opportunity to address the proper remedy here. The defendant shall be given ten days in which to file a brief on the issues noted by the court in the foregoing memorandum. The government shall be given ten days following the filing of the defendant's brief to file a response. The parties shall also inform the court if they believe that an additional hearing is necessary. This motion shall remain pending until the court receives this additional briefing.

28

**Arrest and Detention**

The defendants next contend that they were unlawfully detained at the scene of the stop and afterwards.  The defendants have argued that there was insufficient evidence of probable cause to arrest or detain them for conspiracy to cultivate marijuana.  The government has responded that there was enough evidence at the time of the detention of the defendants to support a charge of cultivation of marijuana.  The government also argues, in the alternative, that there was probable cause to detain the defendants as illegal aliens.

The Constitution requires that arrests by law enforcement officers be supported by probable cause.  <u>See</u> U.S. Const. amend. IV; <u>United States v. Vazquez-Pulido</u>, 155 F.3d 1213, 1216 (10th Cir. 1998).  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1116 (10th Cir. 2007) (en banc) (internal quotation marks omitted).  In determining whether probable cause to arrest exists, the court "evaluates . . . the circumstances as they would have appeared to prudent, cautious and trained police officers."  <u>United States v. Davis</u>, 197 F.3d 1048, 1051 (10th Cir. 1999) (quotation omitted).

The court notes initially that the government has made a token argument that the defendants were not arrested at the scene of the traffic stop.  We must disagree.  Following the search of the car, the deputies placed the defendants and Ms. Lopez in handcuffs. There is little question that they were not free to leave at that time.  See United States v. Perdue, 8 F.3d 1455, 1463, 1464 (10th Cir. 1993).  Accordingly, the court must reject this contention made by the government.

The court is not persuaded that the officers had probable cause to arrest the defendants for conspiracy to cultivate marijuana.  At the time of their arrest, the officers knew that (1) someone had perhaps been moving in the brush around the Beamis House; (2) an empty five-gallon water jug and some duffel bags had been left on the road in front of the Beamis House; (3) a car had been observed traveling on the gravel road near the Beamis House shortly after the perceived movement in the brush; (4) this car was later stopped and three individuals were discovered in it; (5) two of the individuals spoke only Spanish; (6) a full five-gallon water bottle was in the back seat of the car along with some beer and liquor; (7) the car had two large trash bags in the trunk; and (8) the defendants, through Ms. Lopez, had offered dubious explanations for their travels that night.  The officers had found no contraband or items associated with the cultivation of marijuana.  While all of this information provided reasonable suspicion to detain the

defendants for investigatory purposes, these circumstances did not suffice to establish probable cause to believe that the defendants were engaged in a conspiracy to cultivate marijuana. The government has not offered any specifics to support their contention, and we are certainly not persuaded that probable cause existed.

The government has suggested that officers could have arrested the defendants as illegal aliens.[1] For support of this argument, the government relies solely upon the statement of Ms. Lopez in which she indicated to Deputy Clemons that the occupants of the car were illegal aliens.

The Tenth Circuit has made clear that state law enforcement officers "have the general authority to investigate and make arrests for violations of federal immigration laws." United States v. Vasquez-Alvarez, 176 F.3d 1294, 1296 (10th Cir. 1999). They have further noted that federal law "evinces a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws." Id. at 1300. The government's argument here would have merit even though the officers believed that the defendants had committed a different crime. See United States v. Salinas-Calderon, 728 F.2d 1298, 1301-02 (10th Cir. 1984) (Kansas state trooper had probable cause to make

---

[1] In considering this argument, the court notes that the government has not made any argument that Arreola-Gonzalez could have been arrested for failure to possess a valid driver's license.

warrantless arrest of undocumented alien even if trooper did not know with certainty there was a violation of the immigration laws).

The court does not believe that a determination of whether the statements of Ms. Lopez must be excluded has any impact on the decision of what evidence from the vehicle should be suppressed. Even if the deputies exceeded constitutional limits in detaining the defendants, it does not follow that their detention set in motion the chain of events that led the officers to any incriminating evidence.   It is axiomatic that "[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity." Segura v. United States, 468 U.S. 796, 815 (1984) (quotation omitted).   To warrant suppression, a defendant must not only show illegal governmental conduct, but a "nexus" between the illegality and the challenged evidence.   DeLuca, 269 F.3d at 1132.   That nexus requires "at minimum" a showing by the moving party of "but for" causation.   Id.

Here, the defendants have not demonstrated that any evidence obtained from the vehicle was obtained as a result of their illegal detention.   Based upon what the court heard at the hearing, the defendants failed to provide the deputies with any information following their arrests.   The evidence that was obtained from the car shall not be suppressed because it was obtained pursuant to a voluntary consent to search.   The court is also not persuaded that any evidence received from any illegal or unconstitutional actions

by law enforcement led to the discovery of the marijuana field.  At this point, the court is persuaded that this discovery would have been made without any information provided by the defendants or Ms. Lopez following their arrests.  The court will admit, however, that the parties have not thoroughly addressed exactly what evidence should be suppressed in the briefs filed with the court.  The court might be willing to re-examine these issues if the parties present some persuasive arguments.

**Cell Phone**

Perez-Guerrero contends that the evidence retrieved from his cell phone should be suppressed because the search warrant affidavit was defective.  The government has raised a variety of arguments about why the information retrieved from the cell phone should not be suppressed.

In light of the court's decision on the possible exclusion of the statements made by Ms. Lopez, the court has determined that it will delay a decision on this issue at this time.  That decision may have some impact on the search warrant issues.  Once the court decides that issue, the court will turn its attention to arguments made by the parties on the cell phone.  The parties are free to also address this issue in their supplemental briefs.

**OTHER MOTIONS FILED BY PEREZ-GUERRERO**

Perez-Guerrero also filed the following motions:  (1) motion for notice of evidence;  (2) motion for notice of co-conspirator

33

hearsay evidence; (3) motion to disclose expert testimony.  The government filed responses to all of these motions.  At the conclusion of the hearing on pretrial motions, counsel for Perez-Guerrero informed the court that she was satisfied with the responses made by the government.  Accordingly, the court shall deny these motions as moot.

        **IT IS THEREFORE ORDERED** that defendant Arreola-Gonzalez' motion to suppress (Doc. # 23) be hereby denied.

        **IT IS FURTHER ORDERED** that defendant Perez-Guerrero's motion to join in defendant Arreola-Gonzalez' motion to suppress (Doc. # 32) be hereby granted to the extent that he has standing to do so.

        **IT IS FURTHER ORDERED** that defendant Perez-Guerrero's amended motion to exclude witness statements (Doc. # 31) remain, pending further briefing by the parties.  The defendant shall be given ten days in which to file a brief on the issues noted by the court in the foregoing memorandum.  The government shall be given ten days following the filing the defendant's brief to file a response.  The parties shall advise the court if they believe that an additional hearing is necessary to determine any remaining issues on this issue.

        **IT IS FURTHER ORDERED** that defendant Perez-Guerrero's motion to suppress cell phone search (Doc. # 33) remain pending until the court has received additional briefing on the motion to exclude witness statements.

**IT IS FURTHER ORDERED** that the following motions filed by defendant Perez-Guerrero be hereby denied as moot: (1) motion for notice of evidence (Doc. # 26); (2) motion for notice of co-conspirator hearsay evidence (Doc. # 27); and (3) motion to disclose expert testimony (Doc. # 28).

**IT IS SO ORDERED.**

Dated this 2nd day of March, 2012 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge